UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERARDO VILLASENOR,<br><br>Petitioner,<br><br>v.<br><br>M. ELIOT SPEARMAN,<br><br>Respondent. | No. 2:16-cv-03044-JAM-CKD (HC)<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a California state inmate proceeding through counsel with a federal habeas corpus petition filed pursuant to 28 U.S.C. § 2254 challenging his conviction for the attempted premeditated murder of Armando Lopez. Respondent filed an answer to the petition on March 2, 2017 and petitioner filed a traverse on March 3, 2017. ECF Nos. 8, 9. The court ordered supplemental briefing on September 13, 2019 concerning the application of the Supreme Court decision in Harrington v. Richter, 526 U.S. 86 (2011), to petitioner's claim involving newly discovered evidence. The parties submitted briefs in accordance with the court's supplemental briefing schedule. Upon careful consideration of the record and the applicable law, the undersigned recommends that the petition be denied for the reasons set forth below.

**I.     Factual and Procedural Background**

    **A.  Trial Proceedings**

Petitioner was tried before a jury in the Sacramento County Superior Court for two

separate gang-related shootings that occurred in 2010. At the time of both shootings, petitioner was 17 years old. ECF No. 1-4 at 2. In the instant habeas application, petitioner is challenging his convictions only related to the first shooting of Armando Lopez. Therefore, the court will limit its discussion of the factual and procedural history of the case to the shooting at issue.

The California Court of Appeal found the following facts related to the Lopez shooting.[1]

> Armando Lopez was a member of the Norteño criminal street gang and routinely wore red to signify his membership in the gang. During the early morning hours of January 24, 2010, he and three of his roommates left a party and returned to their house on Kesner Avenue in North Sacramento, near Del Paso Heights. One of the roommates drove another roommate's car to and from the party. On the way home, they stopped to pick up some fast food. Each of the roommates had been drinking. Lopez appeared to be the most intoxicated. When the other roommates got out of the car to bring the food into the house, he stayed in the back seat "mumbling." His roommates decided to leave him there while they went inside to eat. A short time later, Lopez managed to get out of the car. But instead of coming inside the house, he walked over to his car, which was also parked in front of the house, and got into the driver's seat.
>
> As Lopez was changing cars, a group of Sureños was driving through the neighborhood. Raquel Benavidez, seated in the back seat behind the driver, testified the driver was Kristen Clancy (who went by the nickname "Huera"), [petitioner][2] (who went by the nickname "Lalo") was seated in the front passenger seat, [petitioner]'s older brother Benjamin (who went by the nickname "Playboy") was seated in the back seat behind [petitioner], and Gisela Chaveste (who went by the nickname "Bubbles") was seated in the middle of the back seat. According to Benavidez, when they passed a Mexican man sitting in a car on the side of the street, either [petitioner] or his brother told Clancy to stop the car, which she did. [Petitioner] and his brother got out of the car and walked over to the man. [Petitioner] asked: "Do you bang? Where are you from?" Benavidez understood these questions to be a gang-related challenge. [Petitioner] then reached into the car and lifted up the man's shirt. Seeing a red belt, [petitioner] said, "he's a Norteño," pulled out a handgun, and shot him twice. [Petitioner] and his brother then got back in Clancy's car and the group drove away as [petitioner] said: "I hope he dies." Benavidez's testimony was largely consistent with prior statements she made in March 2010 to a school counselor and to a police lieutenant who was called by the counselor.

---

[1] This statement of facts does not contain any portion of petitioner's statements to police after he invoked his right to cease questioning. The Court of Appeal omitted these statements because it concluded that they were admitted in violation of Miranda v. Arizona, 384 U.S. 436 (1966).

[2] In order to reflect the current procedural posture of this case, the court has changed all of the references in the direct appeal opinion from "defendant" to "petitioner."

The man [petitioner] shot was Lopez. One of the two bullets passed through the back of Lopez's neck and then struck the passenger side door, where it remained until recovered by police. The other bullet struck Lopez in the shoulder, shattered his clavicle, fractured one of his ribs, and then lodged near his vertebral column, where it remained at the time of trial. His roommates heard the gunshots, came outside to investigate, and found Lopez sitting in his car, bleeding from his neck and shoulder. One of Lopez's roommates asked him what happened, but he "wasn't really making any sense." Another roommate called 911. Police were the first to arrive at the scene. One of the responding officers, who stayed with Lopez until emergency medical personnel arrived, asked him if he knew who shot him. Lopez said he did not. A short time later, Lopez was transported to University of California at Davis Medical Center. He survived his encounter with [petitioner].

Three days later, a detective with the Sacramento Police Department spoke with Lopez at the hospital. Lopez admitted to being a Norteño and confirmed he was wearing a red belt the night he was shot. Thereafter, in April 2010, after Benavidez provided her statement regarding the shooting, the detective again contacted Lopez and showed him several photographic lineups, one of which included [petitioner] and another included Benjamin. Lopez did not positively identify anyone in the lineups. However, according to the detective, he became emotional and seemed on the verge of crying when he looked at the lineup containing [petitioner]'s photograph.

As mentioned, [petitioner]'s brother Benjamin was originally charged with attempted murder and shooting at an occupied motor vehicle. He testified in his own defense, denying he was involved in the shooting. According to Benjamin, he and [petitioner] went to a party on West Silver Eagle Road, also in North Sacramento, but closer to the Norwood neighborhood. Around midnight, [petitioner] left the party with an undisclosed friend. Benjamin stayed behind with one of his friends (who went by the nickname "Peewee") to steal cars from around the neighborhood and bring them back to the house. He did so to impress "some guys" at the party who were studying to become automotive technicians at a local technical institute. Other than four or five short trips to steal cars, Benjamin stayed at the party until around 4:00 a.m., at which point he left the party with Peewee. Benjamin denied seeing his brother, Clancy, Benavidez, or Chaveste during the early morning hours of January 24 and further denied being in Clancy's car. This portion of Benjamin's testimony was corroborated by evidence he wore an ankle monitor at the time of the shooting that did not register his presence at the crime scene. This testimony was also corroborated by stolen car reports.

During cross-examination, after a break in the proceedings, Benjamin stated he remembered [petitioner] briefly coming back to the party with "a group of friends" around 2:00 a.m. According to Benjamin, there were "no females" in this group. Benjamin admitted calling [petitioner] at 3:37 a.m., which was right around the time Lopez was shot. As he explained the reason for the call, someone

3

had taken one of the cars he had previously stolen that night, and he called his brother to ask if someone in [petitioner]'s group had done so. Benjamin also admitted [petitioner] called him a short time later, claiming [petitioner] told him "not to go out because there was a lot of cops." Cell phone records confirmed these calls were made, and placed [petitioner]'s cell phone in the area of the shooting at 3:37 a.m. Benjamin testified [petitioner] later admitted shooting a Norteño after leaving the party. As he recalled the admission, "he told me he shot a buster up close." The word "buster" is a derogatory term used by Sureños to disrespect Norteños. This testimony was corroborated by a prior consistent statement Benjamin made the same day. In response to a text message from Peewee asking, "What did [petitioner] say about yesterday," Benjamin responded: "He told me he [shot] a buster up close."

Thus, while Benjamin's testimony was inconsistent with that of Benavidez, at least as to his involvement in the shooting, it also served to corroborate her identification of [petitioner] as the shooter by providing [petitioner]'s admission to "shoot[ing] a buster up close." However, Benavidez's testimony was also inconsistent with that of Chaveste, who denied seeing a shooting while in Clancy's car and further denied ever hanging out with both [petitioner] and Benjamin at the same time. She did admit to being in a car with Clancy and [petitioner], and possibly other people, but testified this was "probably before January," although she denied remembering "anything about that day." She also admitted telling police in a March 2010 interview that the car ride happened "two months prior," which would place the ride in January; and while she denied witnessing a shooting during that interview as well, she told police [petitioner] was carrying a black semi-automatic handgun in the car.

Based on the foregoing, [petitioner] was convicted of attempted murder and shooting at an occupied motor vehicle, with various gang and firearm enhancement allegations found to be true.

ECF No. at 1-4 at 4-7. These state court factual findings are entitled to a presumption of correctness in federal habeas review. See 28 U.S.C. § 2254(e)(1).

With respect to the Lopez shooting, petitioner was sentenced to 19 years in prison plus an additional 25 years to life based on the specific enhancements found true by the jury.[3] See Lodged Doc. No. 5 (Clerk's Transcript) at 1240-1243 (Abstract of Judgment).

### B. Direct Appeal Proceedings

On direct appeal, petitioner raised a Fifth Amendment challenge to the admission of his

---

[3] Petitioner was sentenced to an additional 5 years, 8 months in prison plus a consecutive 25-Life term for the counts related to the second shooting incident. See Lodged Doc. No. 5 at 1240-1243. The total prison sentence for both shootings amounts to 50 years to life plus an additional 24 years and 8 months. Id.

statements to police. ECF No. 1-4 at 9-35. Petitioner argued that "he clearly and unequivocally invoked his right to remain silent during his interrogation by telling the interrogating officer – 13 times in the span of 14 minutes – to take him home, and during this period of time further told the officer to call his parents so they could pick him up."[4] ECF No. 1-4 at 2-3. According to petitioner, continued questioning violated petitioner's rights under Miranda v. Arizona, 384 U.S. 436 (1966), and should have been suppressed prior to trial.[5] The California Court of Appeal concluded that the admission of petitioner's statements violated his Miranda rights, but ultimately found that this error was harmless beyond a reasonable doubt. See ECF No. 1-4 at 3 (direct appeal opinion).

In reaching this conclusion, the California Court of Appeal concluded that "a reasonable officer in [the] Detective[']s position would have understood [petitioner's] repeated demands to be taken home, to have his parents called to pick him up, and to wait out the 48 hours [to be formally charged], to be an unambiguous invocation of his right to end the interrogation." ECF No. 1-4 at 28. Part of its conclusion rested on the court's review of the videotape demonstrating petitioner's demeanor during questioning. ECF No. 1-4 at 28, 30. Petitioner's "demeanor became that of a young man who had decided to end the interrogation." Id. Based on the detective's failure to end the interrogation at that point, petitioner's right to cease questioning pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), was violated and his subsequent statements were erroneously admitted at trial. Id. at 29.

Upon finding a Miranda violation, the California Court of Appeal conducted a harmless error analysis pursuant to Chapman v. California, 386 U.S. 18 (1967), and concluded that the error was harmless beyond a reasonable doubt. ECF No. 1-4 at 32-35. The evidence of

---

[4] Petitioner's questioning by police was videotaped. Thus, as the California Court of Appeal emphasized, "[t]here is no factual dispute over what questions were asked by [the] Detective…, what answers were given by [petitioner], whether petitioner demanded to be taken home and have his parents called to pick him up, how many times he made these demands, or the context in which they were made." ECF No. 1-4 at 22.

[5] Petitioner also raised a general voluntariness challenge to the admission of his statements to police which is not raised in his federal habeas challenge and therefore not relevant to the pending proceedings.

petitioner's guilt that remained after excluding his post-invocation statements was not only sufficient to support the verdict, but also overwhelmingly established his guilt beyond a reasonable doubt. ECF No. 1-4 at 32-33 (citing Christopher v. Florida, 824 F.2d 836, 846 (11th Cir. 1987)). This conclusion was supported by Raquel Benavidez's eyewitness identification of petitioner as the shooter in court; her account of the number of bullets fired that was supported by the medical evidence; the victim's hospital admission that he was a Norteño gang member wearing a red belt at the time of the shooting; petitioner's brother's "highly incriminating evidence" that petitioner confessed to having "shot a buster up close" on the night of the offense; cell phone records placing petitioner in the area of the shooting at the time of the crime; and, the victim's display of emotion when he viewed a photo lineup containing petitioner's photograph. ECF No. 1-4 at 33. The California Court of Appeal also relied upon petitioner's admissions prior to invoking his Miranda rights which included his admission that he was a Sureño gang member and that his parents' house had been shot at by rival Norteño gang members, giving him "a powerful motive to retaliate against Norteños." ECF No. 1-4 at 34. The court also emphasized that petitioner's post-invocation statements did not include a confession to either of the two shootings with which he was charged. ECF No. 1-4 at 34-35. "He made inconsistent statements, and placed himself at or near the scenes of the crimes yet steadfastly denied his involvement. Without minimizing the damaging nature of the statements [petitioner] made after he invoked his right of silence, they would not have carried the extreme probative weight of a confession." ECF No. 1-4 at 35. Based on all this evidence, the state court found the Miranda violation to be harmless beyond a reasonable doubt. ECF No. 1-4 at 35.

### C. State Habeas Proceedings and Newly Discovered Evidence

Following his direct appeal, petitioner filed a state habeas corpus petition in the California Supreme Court raising the Miranda violation plus additional newly discovered evidence impeaching the prosecution's main eyewitness to the attempted murder conviction for the Lopez shooting. See ECF No. 1 at 3. In a declaration signed under penalty of perjury on August 12, 2016, Kristen Clancy averred that she sold her 1997 red Mercury Tracer on October 13, 2009 to Pick and Pull Auto Dismantlers. ECF No. 1-3 at 1. She further indicates that while Raquel

Benavidez was familiar with this car before it was sold, any testimony that they were in the vehicle on January 24, 2010, the night of the Lopez shooting, "would be untrue." ECF No. 1-3 at 1. In her declaration, Ms. Clancy acknowledges that at the time of petitioner's trial she "faced charges" related to the Lopez shooting and that she did not testify at his trial.[6] Id. Also attached to the declaration is a business record from Pick-N-Pull Auto Dismantlers, LLC indicating that a 1997 red Mercury Tracer owned by Kristen Clancy was received on October 13, 2009 and subsequently sold. ECF No. 1-3 at 2. Respondent does not challenge the authenticity of these documents.

In his California Supreme Court habeas application, petitioner argued that this new evidence demonstrated the prejudicial nature of the Miranda violation. Lodged Doc. No. 22. Petitioner alternatively challenged trial counsel's effectiveness for failing to investigate and present this information to the jury. See Lodged Doc. No. 22. The California Supreme Court issued a summary denial of this habeas petition on November 30, 2016. See Lodged Document No. 23.

## II. Legal Standards

### A. Standards Governing Habeas Corpus Relief

To be entitled to federal habeas corpus relief, petitioner must affirmatively establish that the state court decision resolving the claim on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or … resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our

---

[6] In his habeas application, petitioner indicates that Ms. Clancy was unavailable to testify at petitioner's trial because she was awaiting sentencing for being an accessory after the fact to the attempted murder charged in count one of the indictment. ECF No. 1-2 at 26.

7

> decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Clearly established federal law also includes "the legal principles and standards flowing from precedent." Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002) (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)). Only Supreme Court precedent may constitute "clearly established Federal law," but circuit law has persuasive value regarding what law is "clearly established" and what constitutes "unreasonable application" of that law. Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044, 1057 (9th Cir. 2004).

Relief is also available under the AEDPA where the state court predicates its adjudication of a claim on an unreasonable factual determination. 28 U.S.C. § 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court. See also Cullen v. Pinholster, 563 U.S. 170 (2011). Under § 2254(d)(2), factual findings of a state court are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret

8

1  "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in
2  § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the
3  same record could not abide by the state court factual determination. A petitioner must show
4  clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546
5  U.S. 333, 338 (2006).

6  In applying these standards, federal courts review the last reasoned state court decision on
7  each claim for relief. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). "Where there has been
8  one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that
9  judgment or rejecting the same claim rest upon the same ground." Ylst, 501 U.S. at 803; see also
10 Gill v. Ayers, 342 F.3d 911, 917 n. 5 (9th Cir. 2003) (explaining that federal courts "look
11 through" unexplained rulings of higher state courts to the last reasoned decision). When there is
12 no reasoned state court decision or what is known as a silent denial, federal courts must conduct
13 an independent review of the record to determine what rational could support the state court
14 judgment and whether such rational was an objectively reasonable application of federal law. See
15 Harrington v. Richter, 562 U.S. 86, 102 (2011); Cullen v. Pinholster, 563 U.S. 170 (2011);
16 Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

17 To prevail in federal habeas proceedings, a petitioner must establish the applicability of
18 one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional
19 invalidity of his custody under pre-AEDPA standards. Frantz v. Hazey, 533 F.3d 724 (9th Cir.
20 2008) (en banc). There is no single prescribed order in which these two inquiries must be
21 conducted. Id. at 736-37. The AEDPA does not require a federal habeas court to adopt any one
22 methodology. Lockyer v. Andrade, 538 U.S. 63, 71 (2003).

23  **B. Standards Governing Ineffective Assistance of Counsel Claims**

24 The two prong Strickland standard governing ineffective assistance of counsel claims is
25 well known and oft-cited. Strickland v. Washington, 466 U.S. 668 (1984). It requires petitioner
26 to establish (1) that counsel's representation fell below an objective standard of reasonableness;
27 and, (2) that counsel's deficient performance prejudiced the defense. Strickland, 466 U.S. at 692,
28 694. "The question is whether an attorney's representation amounted to deficient performance

9

1   under 'prevailing professional norms,' not whether it deviated from best practices or most
2   common custom." Harrington v. Richter, 562 U.S. 86, 105 (2011) (citing Strickland, 466 U.S. at
3   690). Prejudice is found where "there is a reasonable probability that, but for counsel's
4   unprofessional errors, the result of the proceeding would have been different. A reasonable
5   probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466
6   U.S. at 693. "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result."
7   Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (quoting Richter, 562 U.S. 86, 111-12 (2011)).

8      In reviewing a Strickland claim under the AEDPA, the federal court is "doubly
9   deferential" in determining whether counsel's challenged conduct was deficient. "When §
10  2254(d) applies, the question is not whether counsel's actions were reasonable. The question is
11  whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."
12  Richter, 562 U.S. 86, 105 (2011).

13  **III.  Analysis**

14      Upon initial review of petitioner's habeas application, the court understood petitioner to
15  be raising two separate claims for relief. In his first claim for relief petitioner asserts a Miranda
16  challenge to the admission of petitioner's statements along with newly discovered evidence
17  undercutting the state court of appeal's harmless error analysis. The court labeled this as a
18  "Miranda plus" claim. See ECF No. 13 at 2-3 (supplemental briefing order noting that the
19  California Supreme Court reviewed the Miranda claim plus the additional impeachment evidence
20  of the prosecution's main witness on state habeas review). Secondly, petitioner raises a separate
21  ineffective assistance of counsel claim based on the failure to obtain this newly discovered
22  evidence prior to trial. See ECF No. 13 at 1-2, n. 1. In his supplemental brief, however,
23  petitioner clarified the specific claims he is raising on federal habeas. See ECF No. 16 at 2.
24  "Claim one calls for review of the unsupplemented state court record on the direct appeal, to
25  determine whether the state court of appeal unreasonably found non-prejudicial error from the
26  Miranda violation. Claim two calls for review of the same question, but supplemented by the
27  Kristen Clancy declaration which was offered to the California Supreme Court through habeas
28  review." ECF No. 16 at 2. In his supplemental briefs, petitioner never identifies the clearly

established federal law that permits, much less requires, a federal habeas court to reweigh a state court's harmlessness determination based on new evidence that was never presented to the jury. Perhaps recognizing this fundamental defect, petitioner pleads count two "in the alternative" by alleging that "petitioner was denied the right to counsel guaranteed by the Sixth Amendment to the United States Constitution, for failure of appointed trial counsel to present this additional evidence to impeach the state's primary witness." ECF No. 16 at 3. The court will address these two claims in the order presented in petitioner's federal habeas application.

### A. Miranda Claim

Neither petitioner nor respondent challenge the state court's conclusion that petitioner's Miranda rights were violated based on the police officer's continued questioning of him after he validly invoked his right to remain silent. Accordingly, the state court's finding of error is not disputed in these federal habeas proceedings. See Ruff v. Kincheloe, 843 F.2d 1240, 1241-42 (9th Cir. 1988) (proceeding directly to the harmless error analysis where the respondent conceded Sandstrom error in a jury instruction); Nguyen v. McGrath, 323 F.Supp.2d 1007, 1016 (N.D. Cal. 2004) (proceeding directly to the harmless error analysis where the respondent conceded a Miranda violation). Since the constitutional error is conceded, the court proceeds directly to the question of the prejudice resulting from the error. Petitioner suffered prejudice if the admission of his erroneously admitted statements to the police had a substantial and injurious effect on the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619 (1993). The Brecht harmless error standard has been further defined as a "grave doubt" or an error that "substantially influenced the jury's verdict." O'Neal v. McAninch, 513 U.S. 432, 436 (1995). "[W]here the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the constitutional violation has affected the verdict and habeas relief is warranted. O'Neal, 513 U.S. at 437.

#### 1. Last Reasoned State Court Opinion

With respect to this claim, the parties agree that the last reasoned state court decision was the California Court of Appeal's decision on direct appeal. In its harmless error analysis, the

////

California Court of Appeal applied the Chapman[7] standard of review and concluded that the evidence that remained after petitioner's post-invocation of Miranda was not only sufficient to support the verdict, but also overwhelmingly established petitioner's guilt beyond a reasonable doubt. ECF No. 1-4 at 32-33. The court reasoned that:

> With respect to the first shooting, [Raquel] Benavidez, who was in the car when [petitioner] got out, walked over to Lopez's car, and shot the intoxicated man twice at close range, identified [petitioner] as the shooter in court. Her testimony that [petitioner] lifted up the man's shirt and said, 'He's a Norteno,' before firing two rounds into the man was corroborated both by the medical evidence Lopez was shot twice, once in the neck and once in the shoulder, and by Lopez's statement at the hospital that he was a Norteno and he was wearing a red belt at the time he was shot. While her testimony with respect to who else was in the car, specifically [petitioner]'s brother Benjamin and Chaveste, was disputed by testimony from these witnesses and by evidence Benjamin's ankle monitor did not register his presence at the crime scene, Benjamin provided highly incriminating evidence against his brother, i.e., [petitioner]'s confession to having 'shot a buster up close' the night Lopez was shot. Thus, while Benjamin denied being in the car at the time of the shooting, his testimony corroborated Benavidez's identification of [petitioner] as the shooter by providing [petitioner]'s own admission to 'sh[ooting] a buster' that night. Cell phone records also confirmed [petitioner]'s presence in the area of the shooting at the time Lopez was shot. We also note that while Lopez did not identify [petitioner] as the shooter, he became noticeably emotional when shown a photographic lineup containing [petitioner]'s picture.

ECF No. 1-4 at 33 (direct appeal opinion). In summarizing, the California Court of Appeal characterized all of this evidence as "overwhelming" and concluded that the admission of petitioner's post-invocation statements, while violative of Miranda, was harmless beyond a reasonable doubt. ECF No. 1-4 at 34-35.

**2. AEDPA Analysis**

Petitioner's central argument in this first claim for relief amounts to an attack on the credibility of Raquel Benavidez who testified that she drove the car to and from the scene of the shooting. Petitioner characterizes Raquel Benavidez's testimony as "the linchpin of the state's case" and then proceeds to highlight every inconsistency in her testimony in order to undercut the state court's harmless error determination. ECF No. 9 at 5. However, this court's review of the

---

[7] Chapman v. California, 386 U.S. 18 (1967).

trial testimony suggests that petitioner's brother's testimony at trial was the most incriminating and powerful evidence against petitioner. Gerardo and Benjamin Villasenor were not only family members because they were brothers by birth, but they also belonged to the same gang. Those two affinities to petitioner made Benjamin's testimony recounting petitioner's confession that he "shot a buster up close" all the more powerful. Indeed, the California Court of Appeal described this testimony by petitioner's brother as "highly incriminating evidence." ECF No. 1-4 at 33. Notably absent from petitioner's argument is any mention of his brother's testimony. There is simply no way to explain away petitioner's admission to his brother that he "shot a buster up close" on the night of the shooting.[8] Moreover, before validly invoking his right to remain silent, petitioner had already admitted his gang affiliation and motive to retaliate against Norteño gang members. This court has examined the role that petitioner's tainted confession played in the context of the entire trial and concludes that it did not have a substantial and injurious effect on the verdict in light of the incriminating testimony of petitioner's brother, the cell phone evidence placing petitioner in the vicinity of the shooting, and the physical evidence corroborating Benavidez's testimony. See Brecht, 507 U.S. 619 (1993). Having failed to demonstrate prejudice resulting from the Miranda violation, petitioner is not entitled to habeas relief and the court recommends denying this claim for relief.

### B. Miranda Plus New Evidence Claim

Before the court undertakes its analysis of this claim for relief, it is necessary to determine whether the Kristen Clancy declaration at issue does, in fact, constitute "newly discovered evidence" that was first presented to the California Supreme Court on state habeas review, as petitioner indicates. A review of the trial court record demonstrates that the information in Ms. Clancy's declaration as well as the print-out from Pick-N-Pull Auto Dismantlers was admitted by stipulation at petitioner's preliminary hearing. See Lodged Doc. No. 1 at 294 (preliminary

---

[8] Even assuming that petitioner were to argue that his brother's trial testimony was not credible, which he does not, the credibility of a trial witness is a factual determination that is entitled to a presumption of correctness on federal habeas review unless it is rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Schlup v. Delo, 513 U.S. 298, 330 (1995) (recognizing that a credibility determination made by a jury "is generally beyond the scope [of federal habeas] review").

1  hearing transcript indicating that "the parties hereby stipulate that Brenda Smith, custodian of
2  records for Pick and Pull Auto Dismantlers would testify that… Kristen Clancy sold her 1997 red
3  Mercury Tracer… on October 10th, 2009 and that Pick and Pull Auto Dismantlers took custody
4  of the vehicle on October 12th, 2009."). Thus to call this information "newly discovered
5  evidence" is a gross mischaracterization of the trial court record. Accordingly, this court finds
6  that the Clancy declaration does not constitute newly discovered evidence.

### 1. Last Reasoned State Court Opinion

Petitioner's Miranda claim as supplemented by the Clancy declaration and the alternative ineffective assistance of counsel claims were presented to the California Supreme Court via a state habeas petition. In its decision, the California Supreme Court did not provide a reasoned explanation for its denial. Nonetheless, there is a presumption, which petitioner does not rebut, that these claims were adjudicated on the merits by the California Supreme Court. See Harrington v. Richter, 562 U.S. 86 (2011) (finding that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); Johnson v. Williams, 133 S. Ct. 1088, (2013). In such circumstances, this court independently reviews the record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." 562 U.S. at 102. It is the petitioner's burden "to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98). The issue before the court with respect to claim two is whether the state habeas court's determination that the Clancy declaration did not alter the harmlessness of the error is contrary to or an unreasonable application of clearly established federal law.

### 2. AEDPA Analysis

Petitioner argues in his second claim for relief that the newly discovered evidence in the

14

form of the Clancy Declaration "increases the likelihood of prejudice from the improper admission of petitioner's incriminating statement to investigation officers, and increases the likelihood that the constitutional error had a substantial and injurious effect on the outcome." ECF No. 16 at 3.  There are numerous defects with this argument.  First and foremost, even petitioner does not suggest that this additional impeachment establishes sufficient prejudice from the Miranda violation to warrant relief.  At best, petitioner merely suggests that it "increases the likelihood…."  ECF No. 16 at 3.

Secondly, petitioner's briefs do not contain any clearly established federal law demonstrating the unreasonableness of the California Supreme Court's rejection of this claim.  As respondent correctly points out, "[t]he Supreme Court certainly has never found that evidence not presented at trial can show that [a] Miranda error is prejudicial."  ECF No. 17 at 3.  There is no clearly established federal law that required the California Supreme Court to re-weigh the evidence of harmlessness on state habeas review in light of the Clancy declaration that was never admitted at trial.  Put simply, there is no legal support for petitioner's argument in claim two.[9]

Lastly, in the analogous case of United States ex. Rel. Hinton v. Snyder, 203 F. Supp. 2d 934 (N.D. Ill. May 22, 2002) ("Hinton"), the habeas petitioner introduced new evidence of systematic police abuse during interrogations to challenge the admission of his confession at trial.  After reviewing the new evidence which included police beatings and torture during interrogations at one Chicago police station where petitioner was held for two days before confessing, the state habeas court denied relief finding that the "tendered documents did not explain, with any degree of specificity, how the petitioner's constitutional rights were violated."  Hinton, 203 F. Supp. 2d at 941.  The federal habeas court determined that "Mr. Hinton's confession and his trial testimony attempting to explain it were damning, but the remaining evidence against him, particularly his admission… that he had shot the victims, was so strong as to leave no doubt that the verdict was not substantially affected by the admission of his

---

[9] For this same reason, the court will deny petitioner's request for an evidentiary hearing in order to present the testimony of Kristen Clancy.  See ECF No. 10.  Absent a finding of § 2254(d)(1) error, there is no basis for an evidentiary hearing.  See Cullen v. Pinholster, 563 U.S. 170 (2011); Runningeagle v. Ryan, 686 F.3d 758, 773 (9th Cir. 2012).

1 confession." Hinton, 203 F.Supp.2d at 945 (citing O'Neal v. McAninch, 513 U.S. 432, 437
2 (1995)). Similarly, in this case, the new evidence of the Clancy declaration does not dispel the
3 most damning evidence against petitioner, i.e. his confession to his brother that he "shot a buster."
4 In light of this evidence and the lack of any clearly established federal law warranting habeas
5 relief, the court recommends denying petitioner's second claim for relief based on an asserted
6 Miranda violation in conjunction with his new evidence. See 28 U.S.C. § 2254(d)(1).

      **C. Ineffective Assistance of Counsel Claim**

8       Petitioner alternatively suggests in his second claim for relief that trial counsel was
9 ineffective for failing to investigate and interview an available witness, i.e. Kristen Clancy. ECF
10 No. 1-2 at 26. In his supplemental brief, petitioner also alleges that trial counsel failed "to present
11 this additional evidence to impeach the state's primary witness." ECF No. 16 at 3. Therefore, the
12 court will address this claim as both a failure to investigate/interview Kristen Clancy as well as a
13 failure to present this impeachment evidence at trial.
14       Turning first to trial counsel's failure to investigate the information in the Clancy
15 Declaration, this claim is belied by the record and should be denied on that basis alone. Trial
16 counsel's performance was not deficient for failing to investigate and discover this evidence
17 because it was discovered prior to the preliminary hearing. Therefore, there is no factual basis to
18 support an ineffective assistance of counsel claim for failing to investigate the status of the red
19 Mercury Tracer prior to trial. The undersigned recommends denying the ineffective assistance of
20 counsel claim because the California Supreme Court could have reasonably determined that
21 counsel's performance was not deficient because this evidence was discovered prior to the
22 preliminary hearing. Accordingly, this impeachment evidence was adequately investigated and
23 the state court's rejection of this claim is neither contrary to nor an unreasonable application of
24 Strickland.
25       While the record establishes that petitioner's trial counsel was aware of the status of Ms.
26 Clancy's red Mercury Tracer prior to trial, he did not seek to introduce this evidence at trial to
27 impeach Ms. Clancy's trial testimony. There is no evidence in the record that Ms. Clancy was
28 ////

available to testify at petitioner's trial due to her status as a co-defendant.[10]  It is true, however, that trial counsel could have called the records custodian for Pick and Pull Auto Dismantlers to testify concerning the business record of the transaction itself.  Assuming arguendo that trial counsel's performance was deficient in this respect, the California Supreme Court could have reasonably concluded that there was not a reasonable probability of a different outcome had the impeachment evidence been presented at trial.  See Strickland, 466 U.S. at 694 (defining prejudice).  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.; see also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  In this case, the court's confidence in the outcome is not undermined by a single piece of impeachment evidence of a single prosecution witness in light of the testimony of petitioner's brother and the additional evidence corroborating his testimony.  The failure to introduce this one piece of impeachment evidence is not sufficient, in and of itself, to meet the high threshold of demonstrating prejudice under Strickland.  See Allen v. Woodford, 395 F.3d 979, 999 (9th Cir. 2005) (finding that counsel's impeachment was adequate and that any failure to "elicit additional evidence was inconsequential, especially in light of the evidence of guilt.").  Petitioner's counsel acknowledges that this could have been a basis for the California Supreme Court to deny petitioner habeas relief.  See ECF No. 16 at 9 ("[a]ssuming that the California Supreme Court saw little additional value in the Clancy declaration….").  Fairminded jurists would not disagree with that conclusion.[11]  The particular car that was used to drive to and from the shooting was not a critical issue at trial.  Impeaching Benavidez with this additional information would not have created a vastly different impression of her veracity as a witness to have changed the outcome at trial.  See Richter, 562 U.S. at 112 (emphasizing that "[t]he

---

[10] The court notes that even in her Declaration, Ms. Clancy did not indicate that she was willing to speak with petitioner's trial counsel much less to testify at his trial concerning the sale of her Mercury Tracer.  See ECF No. 1-3 (Declaration of Kristen Clancy).  Petitioner concedes that he only has a viable ineffective assistance of counsel claim if Ms. Clancy was an available witness at trial.  See ECF No. 1 at 26.

[11] Indeed, even petitioner's counsel cannot explain why that conclusion was unreasonable.  See ECF No. 16 at 9.

likelihood of a different result must be substantial, not just conceivable.") (citing Strickland, 466 U.S. at 693). Even with all the impeachment evidence presented at trial that petitioner focuses on in his first claim for relief, the jury still chose to believe Benavidez's testimony concerning the identity of the shooter. For all these reasons, the court finds that petitioner has not met his burden of demonstrating the unreasonableness of the state court's rejection of his ineffective assistance of counsel claim under the prejudice prong of Strickland.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus (ECF No. 1) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: July 30, 2020

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

12/vila3044.F&R.docx